# THE UNITED STATES DISTRICT COURT
# FOR THE
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| United States of America | |
| v. | 07-CR-0189-03-GZS |
| Cirino Gonazalez | |

## SENTENCING MEMORANDUM IN SUPPORT OF A DOWNWARD VARIANCE

### I. Cirino Gonzalez the Person

While the presentence report does an adequate job of recounting Cirino Gonzalez's personal history, it falls short in conveying his personal characteristics, i.e., the kind of person he has been, which a more focused consideration of his life reveals. Mr. Gonzalez is the proud son of an Hispanic extended family who has been self-reliant since the age of fourteen; he has, through drive and hard work, accumulated more than two years' worth of college credits; his patriotism to his country is well reflected in his seven years of meritorious and honorable service in the U.S. Navy; he is a committed father to his four children; and, he is a person who stands up for what he believes, even when that finds him in opposition to the government he so faithfully served for seven years of his life. In short, Cirino Gonzalez is not a typical defendant in a case such as this.

Mr. Gonzalez's early years are recounted in ¶79 of the presentence report (PSR). He was born to a marital union which dissolved when he was but two years old. Thereafter, he alternated living amongst his father, his grandparents, and other members of his extended family in the greater Alice, Texas area. He had little or no contact with his natural mother. The person who probably had the greatest influence on him was his step mother, Irene Rangel, who has since divorced his father. At age fourteen, Mr. Gonzalez went out on his own and has been self-supporting since then. Interestingly, Mr. Gonzalez does not look back on his upbringing in unfavorable terms at all. He does not blame anyone else for the early circumstances of his life and says he has "never felt screwed up." Instead, he sees those years as the backdrop for his developing a strong and

independent will accompanied by an attitude of simply living as best as he could.

Mr. Gonzalez attended various public schools before, as cited in ¶85 of the PSR, he was expelled from Alice, Texas High School at age fifteen. Nonetheless, he soon thereafter obtained his GED. Some time later, while working, he began attending Bee County Community College at its satellite campus in Alice where his studies focused on criminal justice. His performance was such that he was awarded a scholarship to assist him financially with his studies. Although he did not finish his studies there (due to his decision to enlist in the U.S. Navy at age eighteen), he went on to take additional courses while in the service and has accumulated in excess of seventy college credits. This is certainly the mark of someone who has sought to better himself personally and educationally.

Though not specifically related in the PSR, Mr. Gonzalez was married to his high school sweetheart, Melinda Rodriguez, while on leave after completing basic training with the Navy. Originally, their hope was to put off having children, but his wife became pregnant within a year, and they have since had a total of four children ranging in age from seven to thirteen. Mr. Gonzalez's service commitment caused extended separations from his family. Ultimately, Mr. Gonzalez and his wife were divorced in 2004. Their relationship has remained cordial, however, with Mr. Gonzalez remaining actively involved in his childrens' lives and paying child support. The importance of family to Mr. Gonzalez is reflected in the following excerpt of an email from a friend, Rosemarie Harvey:

> *When he was sent to Iraq, it meant saying goodbye and not seeing his children, yet he did this to help make a difference, and to better conditions in the middle east. He has a character that stands up for his believes (sic) and the rights of all. He always respects the opinion of others and the rights people have. He never shies away from his responsibilities as a citizen, as a father, as a son, a brother and a friend, and can always be counted on by others. Cirino is trustworthy and has a strong family relationship and values that above all else. (Email letter from Rosemarie Harvey dated September 6, 2008, p. 1).*

Mr. Gonzalez's seven years' service in the U.S. Navy from 1995 to 2002, which included deployment during the Kosovo Campaign, was exemplary. This is strongly suggested by the many awards/decorations/medals and honorable discharge he received, all of which are recounted in ¶86 of the PSR. Perhaps the best flavor of what Mr. Gonzalez brought to his service, however, is reflected in the following Citation he received from Admiral Thomas B. Fargo of the U.S. Navy, Commander in Chief, U.S. Pacific Fleet:

> *For outstanding performance of duty as a member of the Mark 13 Intermediate Maintenance Team, Pearl Harbor Naval Shipyard and Intermediate Maintenance Facility, Pearl Harbor, Hawaii from January to October 2001. Petty Officer Gonzalez consistently performed his demanding duties in an exemplary and high professional manner. Working hand in hand with ships force personnel and United Defense technical contractors, he supervised the Mark 13 Intermediate Maintenance System package performed onboard the USS REUBEN JAMES (FFG 57) and the USS CROMMELIN (FFG 37). His exemplary pride and initiative coupled with his technical expertise enabled him to direct and lead the Mark 13 Intermediate Maintenance System team. With selfless dedication and drive, he worked many overtime hours and significantly contributed to the successful completion of 34 labor-intensive Mark 13 Intermediate Maintenance System jobs with a total of 3,360 man-hours. He personally supervised the repairs of several launcher casualties, and his actions resulted in the repair of a launcher hoist casualty and the overhaul of the blast door drive unit. Petty Officer Gonzalez' outstanding professional performance and total dedication to duty reflected credit upon himself and were in keeping with the highest traditions of the United States Naval Service.*

Mr. Gonzalez's disenchantment with the veracity of the government is rooted in certain personal experiences in the military and at work, and his personal reflections on them. The first instance he cited was an experience during the Kosovo Campaign where, despite the fact that the conflict was over for a month, the Navy continued doing war exercises; he found this disconcerting. After the events of September 11, 2001 and after speaking with others he knew in the military, Mr. Gonzalez came to seriously doubt many of the accounts of the government related to that day, especially that of the airplane crash at the Pentagon. After leaving the military, Mr. Gonzalez had several jobs as recounted in ¶¶88-92 of the PSR. He first became acquainted with the "alternative media" while working as the manager of the Thunder Road night club. Over time, he came to seriously doubt the wisdom of the government's decision to pursue war in Iraq, and was attracted to the anti-war efforts of Cindy Sheehan. This, in turn, led Mr. Gonzalez to seek a job as a weapons repair contractor in Iraq in order, he claims, to do his own investigation of what was happening. His job with Lear Sigler Industries was the result, and what he found in Iraq were gross irregularities and rampant corruption.

Upon returning home, Mr. Gonzalez began communicating more extensively with others in the "alternative media." He joined with others in lobbying for peace with various congressmen and participated in a number of anti-war protests. He was also becoming more convinced that the government was no longer being controlled by the people. Mike Hearington, a Vietnam veteran and

founder of the Memphis Chapter of Veterans for Peace, met Mr. Gonzalez at the Media Reform Conference in Memphis in January 2007 and related the following:

> *During this Media reform event a group staged a theatre action on Beale Street and Cirino came along to assist in a security measure as the participants were wearing puppet head figures portraying Bush, Cheney, Rumsfeld and Rice in a chain gang outfit. The action did result in an individual hitting one of the puppet/people which resulted in a bit of a brawl. Cirino very calmly and non aggressively placed himself in the ruckus without becoming angry or engaging physically other than placing himself between combatants. (Email letter of Mike Hearington dated September 6, 2008, p. 1).*

Barbara Cummings, another fellow peace activist, related the following concerning Mr. Gonzalez's similar role at a peace march in Washington later that same month:

> *Cirino was interested in our peace activities so we invited him to join us for a huge march in DC that JAN 27th. We were part of the security team, guarding such personages as congresswoman Maxine Waters and Rocky Anderson, mayor of Salt Lake City. We were front line people, no easy task. Counter protestors taunt you, throw things at you and challenge you. Cirino and I were side by side with locked arms protecting our assigned people all day. You really get to know a person in these type (sic) of situations. (Email letter of Barbara Cummings dated September 7, 2008, p. 1).*

It is in this context – as a peace activist disenchanted with his government, aware of the importance of the income tax to the war effort in Iraq, and mindful of the government's past actions in similar confrontations -- that Mr. Gonzalez made his way to the Browns' residence in Plainfield, NH in January 2007.

## II. **The Offense Conduct**

The defendant has submitted specific objections to those paragraphs relating to the offense conduct contained within the PSR, specifically ¶'s 13-36. The defendant maintains those specific factual objections with respect to the offense conduct as recounted by the probation report.

## III. **Post Booker Sentencing Methodology**

Applying the principles set forth in U.S. v. Booker, 543 U.S. 220 (2005), this Court should certainly consider the guidelines, however, the "departure methodology" of the pre-Booker world is no longer the panacea of sentencing. The Court must impose a sentence that is "sufficient but not greater than necessary." 18 U.S.C. 3553(a).

Generally the Court should follow a three-step sentencing procedure.  United States v. Booker, 543 U.S. 220 (2005).  First the court should determine the guideline range.  Second, the court should decide whether to grant any departures pursuant to the Sentencing Commission Policy statements .  And third, the Court is then to determine the appropriate sentence and shall impose a sentence sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553 (a).  See U.S. v. Fanfan; ___F.3d ___ (2006).

In determining the appropriate sentence that is sufficient but not greater than necessary, it is respectfully submitted that the guideline range as computed by the Court occupies no special stamp of reasonableness.  Rather, the guideline range is simply one factor to be considered by the court in determining the appropriate sentence.  See U.S. v. Pho, 433 F.3d 53 (1st Cir., 2006).

IV.  **Guideline Analysis**

The defendant maintains his objections as stated in his response to the initial probation report in this matter.  In particular, the defendant reiterates that the defendant was not convicted of the separate conspiracies contained within Count Two but rather the jury had an option to convict this defendant of either what the probation report refers to as Count A OR Pseudo Count B.  For purposes of this memorandum, Pseudo Count B is in all respects the same as Count Three.

Assuming arguendo that the Court adopts the probation report's analysis as to the guidelines, Mr. Gonzalez takes certain specific objections to the methodology employed.

a. *Count Two*.  Count Two charges a Conspiracy to Commit Offenses against the United States, in violation of 18 U.S.C. § 371.  The guideline for this statute is U.S.S.G. § 2X1.1(a) which provides "that the base offense level of the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct" be applied.  Count Two, however, is a dual object conspiracy, i.e., hindering the apprehension of the Browns (a violation of 18 U.S.C. § 111[a]) being the first object, and acting as an accessory after the fact to the Browns (a violation of 18 U.S.C. § 3) being the second object.  Accepting that principle, separate guideline

calculations are done for each of the objects, otherwise known as "pseudo counts," in order to determine the total offense level (TOL).

Count A, referring to the first object, requires the application of U.S.S.G. § 2A2.4, this being the guideline for a violation of 18 U.S.C. § 111(a)." The base offense level (BOL) is **10.** The specific offense characteristics (SOCs) at § (b)(1)(A) and (b)(2) clearly do not apply. The SOC at § (b)(2)(B) is a closer call but, in the final analysis, also does not apply. The defendant did possess three firearms but at no point did he threaten use of any of these firearms. The SOC requires both possession and a threat of use of a firearm, and the latter simply did not happen. Accordingly, the total offense level (TOL) for Pseudo Count A is **10**.

Pseudo Count B; (referring to the second object) requires the application of U.S.S.G. § 2X3.1 (a) and (b) which provide that the BOL shall be **6** levels lower than the offense level for the underlying offense and that the BOL under this guideline shall not be less than **4**. The underlying offense is 18 U.S.C. § 111(a). Since the offense level for it is **10**, applying the instruction at (b) that the offense level be reduced by **6** levels, the resulting TOL for Pseudo Count B is, therefore **4**.

There are no Chapter Three adjustments which apply to either pseudo count.

In circumstances such as this, the pseudo count having the higher TOL establishes the TOL for the Count. In this case, Pseudo Count A is clearly higher and results in a TOL for Count Two of **10**.

The assertion that the obstruction of justice guideline at U.S.S.G. § 2J1.2 should be applied because it is the "substantive offense" the defendant committed is simply plain wrong. The definition of "substantive offense" at U.S.S.G. § 2X1.1, comment. (n.2) is crucial: *"'Substantive offense,' as used in this guideline, means **the offense that the defendant <u>was convicted</u> of soliciting, attempting, or conspiring to commit."*** (Emphasis added). The Third Superseding Indictment, alleges the substantive offenses the defendant was convicted of committing. They are preventing

the apprehension of the Browns, in violation of 18 U.S.C. § 111(a), and accessory after the fact, in violation of 18 U.S.C. § 3. Accordingly, the guidelines for violations of these two statutes must be applied. The defendant was not convicted, as required by the definition of "substantive offense," of obstruction of justice.

The guideline for obstruction of justice, i.e., U.S.S.G. § 2J1.2, contains the following information in the "Background":

> *This section addresses offenses involving the obstruction of justice generally prosecuted under the above-referenced statutory provisions.[1] Numerous offenses of varying seriousness may constitute obstruction of justice: using threats or force to intimidate or influence a juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations; obstructing a criminal investigation; obstructing a state or local investigation of illegal gambling; using intimidation or force to influence testimony, alter evidence, evade legal process, or obstruct the communication of a judge or law enforcement officer; or causing a witness bodily injury or property damage in retaliation for providing testimony, information or evidence in a federal proceeding. The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence.*

---

[1] The statutory provisions cited at the beginning of the Commentary to this guideline are: "18 U.S.C. §§ 1001 (*when the statutory maximum term of eight years' imprisonment applies because the matter relates to international terrorism or domestic terrorism, or to sex offenses under 18 U.S.C. § 1951 or chapters 109A [§§ 2241 to 2248], 109B [§ 2250], 110 [§§2251 to 2260A], or 117 [§§ 2421 to 2428], United States Code), 1503, 1505-1513, 1516, 1519. For additional statutory provision(s), see Appendix A (Statutory Index)."

The defendant engaged in none of the activities enumerated as examples of obstruction of justice recounted above. There is no evidence that the defendant himself used threats to intimidate or influence a federal officer. If anyone engaged in obstruction of justice in this case, it was the Browns who defied the Court's orders, holed themselves up in their Plainfield home, and issued threats to federal officers. The defendant was convicted of conspiring to prevent the apprehension of the Browns and to being an accessory after the fact. Review of Appendix A (Statutory Index) of the Guidelines carries no reference to the obstruction guideline (U.S.S.G. § 2J1.2) under a violation of 18 U.S.C. § 111(a) or under a violation of 18 U.S.C. § 3. Moreover, neither of these statutes falls under the statutes referenced in applying under this guideline. (See footnote 1).

Third, the government had the option of presenting this case to the grand jury as an obstruction of justice or conspiracy to obstruct justice and seek an Indictment under any of the many provision in Title 18 for such violations, but did not do so. To apply U.S.S.G. § 2J1.2 for this Count is an incorrect application of the guidelines. It increases Mr. Gonzalez's sentencing exposure more than twofold, and is prohibited.

b. *Count Three*. Count Three charges Accessory after the Fact, in violation of 18 U.S.C. § 3. The guideline for this offense is found at U.S.S.G. § 2X3.1. U.S.S.G. § 2X3.1(a) provides that the BOL shall be "**6** levels lower than the offense level for the underlying offense" except that the BOL shall not be less than **4** or more than **30**. "Underlying offense" is defined in U.S.S.G. § 2X3.1, comment. (n.1) as "the offense to which the defendant is convicted of being an accessory, ..." The central question, then, is determining the guideline for the "underlying offense."

The task is to determine the guideline for the "substantive offense" and the general guideline instructions at U.S.S.G. § 1B1.2(a), i.e., that one is to apply the Chapter Two guideline "to the

offense of conviction," the only exception to this rule not being applicable here.  Pseudo Count B where the defendant conspired amongst other things "forcibly to assault, resist, oppose, impede, intimidate and interfere with federal law enforcement officers in the discharge of their duties, to wit: attempting to arrest Edward Brown and Elaine Brown, in violation of 18 U.S.C. § 111(a)(1).: There is a very clear guideline that is associated with 18 U.S.C. § 111(a): either U.S.S.G. § 2A2.2 or § 2A2.4.  The latter should be applied as the "substantive offense" or "most analogous guideline" because an aggravated assault did not occur.

Accordingly, applying U.S.S.G. § 2A2.4 to Count Three, the BOL is **10**.  As in Count Two, above, no SOCs or Chapter Three adjustments apply.  Returning now to our original guideline, U.S.S.G. § 2X3.1(a)(1) provides that the BOL will be "**6** levels lower than the offense level for the underlying offense" except that the base offense level can not be lower than **4** or higher than **30**.  The TOL for Count Three is, therefore, **4**.

V.  **Given the Facts of This Case, The Court Should Impose a Sentence of Time Served.**

Amongst the factors the Court is obligated to take into consideration at sentencing is that of the "history and characteristics of the defendant." (See 18 U.S.C. § 3553(a)(1).  Mr. Gonzalez's personal history is recounted in § I.  In many respects, that life is one of unexpected accomplishments and personal achievements despite what can only be described as difficult circumstances.

Upbringing.[1] The outline of Mr. Gonzalez's upbringing is recounted in ¶ 79 of the PSR. The defendant was born to a marital union which dissolved when he was but two years old. Thereafter, he alternated living with his father and his grandparents at various places in the greater Alice, Texas area; he had little or no contact with his natural mother. The person who had the most impact on his upbringing was his step mother, Irene Rangel, who has since divorced his father. Out of these circumstances, however, Mr.

---

[1] U.S.S.G. § 5H1.12 renders "lack of guidance as a youth," including a "disadvantaged upbringing," as a prohibited departure factor. Since Booker, however, the Guidelines are advisory, meaning in this context that such a factor can be taken into account by the Court.

Gonzalez developed a strong and independent will. At age fourteen, he went out on his own and has been self-supporting since that time. Despite his early experience, he has never blamed anyone else for the early circumstances of his life. Mr. Gonzalez states that he "never felt screwed up" and simply lived his life as best as he could.

Educational Achievement.[2] As reported in ¶ 85 of the PSR, the defendant attended various public schools before being expelled from Alice, Texas High School while in the ninth grade at the age of 15. He nonetheless went on to obtain his GED at age 15 or 16. Thereafter, while also working, Mr. Gonzalez began attending Bee County Community College at its satellite campus in Alice where his studies focused on criminal justice. He was awarded a scholarship to assist him financially with his studies. Although he did not finish his course of studies there (due in part to his decision to enlist in the U.S. Navy at age 18), he still went on to take various courses while in the Navy and has accumulated over seventy credits toward a college degree. In light of his disadvantaged upbringing, this should be viewed as a remarkable achievement and a reflection of his inner drive to better himself personally and educationally.

Family Ties.[3] Mr. Gonzalez was married to his high school sweetheart, Melinda Rodriguez, at age 18 after completing basic training with the U.S. Navy. As noted in ¶ 80 of the PSR, the couple has had four children ranging in age from seven to thirteen. Their marriage survived separations occasioned by Mr. Gonzalez's deployments while in the Navy. Although they were ultimately divorced in 2004, both Mr. Gonzalez and his ex-wife have enjoyed a cordial relationship. As a matter of fact, he was seeing his children on a daily basis at the time of his arrest in the instant matter. What is further noteworthy is that the defendant's wife and children know of his current circumstances and remain firmly supportive of him.

---

[2] U.S.S.G. § 5H1.2 renders both education and vocational skills as discouraged factors for departure.

[3] U.S.S.G. § 5H1.6 renders family ties a discouraged factor for departure

Exemplary Military Service.[4] Mr. Gonzalez served in the U.S. Navy from June 1995 until November 2002. As reported in ¶ 86 of the PSR, the defendant was a gunner's mate and specialized in weaponry and security. He earned a host of medals and awards, participated in the Kosovo Campaign, and was recommended for re-enlistment. He received an honorable discharge for his service.

Lack of Criminal History.[5] Mr. Gonzalez has no criminal record whatever as reflected in ¶¶ 74 to 78 of the PSR. The U.S. Sentencing Commission has recognized from analysis of its own sentencing statistics that defendants with zero criminal history points and no prior arrests, as a group, have the lowest recidivism rate of 6.8%.[6]

Protection of the Public. The Court is obligated to consider the need for the sentence imposed to "protect the public from further crimes of the defendant." (18 U.S.C. § 3553(a)(2)©. The U.S. Sentencing Commission did a study entitled "Recidivism and the 'First Offender'" (May 2004), the findings of which are instructive here. The report states:

> "This report examines recidivism risk for three plausible first offender groupings consistent with historical Commission definitions of possible first offenders. The three first offender groups all come from offenders with zero criminal history points, and are defined as follows: group A contains offenders with no prior arrests; group B contains offenders with prior arrests, but no prior convictions; and group C contains offenders with only prior convictions that are to never count towards criminal history. Among these groups the lowest recidivism rate is fro group A with a rate of 6.8 percent. Group B has a recidivism rate of 17.2 percent. Group C has a recidivism rate of 8.8 percent." (Pp. 16-17)

The report goes on to say:

> "Moreover, as indicated by their extremely low recidivism rate of 6.8 percent, [group A

---

[4] U.S.S.G. § 5H1.11 renders military service as a discouraged factor for departure.

[5] U.S.S.G. § 5H1.6 renders criminal history relevant for determination of the criminal history category and for a departure in certain circumstances.

[6] See "Recidivism and the 'First Offender,'" U.S. Sentencing Commission Publication, May 2004, p. 17

offenders] are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend." (p.17)

Mr. Gonzalez falls into the Group A category and his likelihood of recidivism is extremely low.

Based on the factual circumstances of this case and based upon Mr. Gonzalez's unique history and life, it is submitted that a sentence of time served is "sufficient" and not greater to comply with the sentencing mandate of 18 U.S.C. § 3553 (a).

                                                Respectfully Submitted,
Cirino Gonzalez,
By His Attorney,

Dated: September 22, 2008                    **LAW OFFICE OF DAVID H. BOWNES, P.C.**

/S/ David H. Bownes
David H. Bownes, Esq.
N.H. Bar No.: 277
486 Union Avenue
Laconia, NH 03246
(603) 524-4330
Office@dhblaw.net

## CERTIFICATION

We hereby certify that on this 22nd day of September, 2008 that a copy of the foregoing Brief Sentencing Memorandum has been served electronically to forwarded to Arnold Huftalen, Esq., United States Attorney's Office, 55 Pleasant St., Concord, NH 03301 via ECF.

_____
David H. Bownes, Esq.